IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LAWRENCE MILLS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL NELSON | : | NO. 20-7037 |
| | : | |

MEMORANDUM

Bartle, J. August 5, 2021

Plaintiff Lawrence Mills brings this action against defendant New Jersey State Police officer Michael Nelson in his individual capacity for alleged violations of plaintiff's rights under the United States Constitution as well as for the commission of various torts under New Jersey law. Plaintiff's claims stem from his arrest at the Golden Nugget Casino on November 2, 2017.[1]

On September 21, 2020, this court dismissed ten of plaintiff's claims against Nelson, leaving only Count IV for malicious prosecution under the New Jersey Tort Claims Act and Count IX for malicious prosecution in violation of plaintiff's Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983. Before the court is the motion of plaintiff for partial summary

---

1. Plaintiff, along with co-plaintiff Daniel Chun, has also brought suit against Golden Nugget and five other New Jersey State Police officers in another action, Mills v. Golden Nugget Atlantic City, LLC, Civil Action No. 19-19610, concerning the events related to the same arrest on November 2, 2017.

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[2] and the motion of Nelson for summary judgment.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s

2. Plaintiff filed this motion for summary judgment against Nelson in Civil Action No. 19-19610 under a case caption for both this matter and No. 19-19610. Plaintiff, however, did not separately file his motion in this matter. Because the motion is the same as against defendants in 19-19610 and against Nelson in this matter and since plaintiff correctly captioned the motion to include both matters, we will consider plaintiff's motion for partial summary judgment in this matter as it relates to Nelson.

position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed. In November 2017 plaintiff and some friends traveled from Maryland to Atlantic City, New Jersey for vacation. They stopped at the Golden Nugget casino and hotel. At the time, Golden Nugget was running a promotion whereby it would match in bonus money the amount a person deposited up to $1,000. Plaintiff loaned a member of his group, Daniel Chun,[3] $1,000 to open an internet gaming ("i-gaming") account under Chun's name. On November 2, 2017 Chun deposited $1,000 in cash at the Golden Nugget cage in the casino. Plaintiff testified at his deposition that he used other people's online gaming accounts to play for them and guaranteed to them a certain amount of any winnings.

After setting up his account, Chun went to the casino's Wine and Wi-Fi lounge but was unable to login to his

3. Chun is plaintiff's co-plaintiff in Civil Action No. 19-19610.

account to start playing. Plaintiff was on his computer in the lounge at the time. Chun called customer service and the casino's technical support desk multiple times for assistance in logging into his account. After unsuccessfully attempting to login following these calls, Chun went to the cashier to request his money back but could not withdraw the funds because his account was frozen.

Antoinette Cafone,[4] the casino's internet gaming and compliance manager, testified at her deposition that a patron may cash out whenever he wants but he cannot cash out the matching bonus money. However, casino personnel can temporarily block the account when the casino believes that something is amiss or wants to investigate a matter further. On November 2, 2017 Cafone was notified by the cage that several individuals from Maryland had consecutively deposited $1,000 in cash for i-gaming accounts. Cafone testified that she found unusual this situation of multiple individuals in a row coming in person to place the same amount for online gaming into newly created accounts. In her experience, most customers deposit money in person for playing on the casino floor and deposit money online for i-gaming accounts.

4. Cafone manages the integrity of the internet gaming system and ensures compliance with Division of Gaming Enforcement regulations.

Jeuel Cato, the online gaming payments analyst for Golden Nugget Online Gaming, testified that she receives automatic reports when there are deposits of $1,000 or more so that the casino can monitor the activity if needed. When she spoke to Chun over the phone about his account being down, his behavior was not typical of a legitimate player and it was suspicious that there was "similar activity between different types of people at relatively the same time or within a close time frame of one another."

On the morning of November 2, Virginia Carr, the surveillance manager for Golden Nugget, filled out a so-called DICE report for "suspicious activity." The report states that "Monitor Room advised in past hour or so 6 deposits of $1,000 each made on i-Gaming accounts. Mostly from Maryland." She testified that it was her call as to what to put in the report and whether to file it at all. After a DICE report is created, it is sent to the Division of Gaming Enforcement of the New Jersey State Police ("Division"). Carr did not speak to any members of law enforcement after filing the report and had nothing to do with the report after she filed it.

The Division receives many DICE reports, and it is up to the State Police whether to follow up on a report with a phone call or a visit to the casino to investigate it further. In this instance, Detective Sergeant Richard Wheeler went to the

casino to follow up on this DICE report. Wheeler works for the New Jersey State Police in the Casino Gaming Bureau and was in the Financial Crimes Unit at the time. Wheeler sees a lot of DICE reports and does not follow up on every report, but he decided to do so in this case. He informed his supervisor, Detective Sergeant Carl Smallwood, that he wanted to investigate this matter further because of potentially fraudulent activity.

Wheeler and Smallwood responded to the DICE report on the afternoon of November 2 with Wheeler leading the investigation. At some point, Wheeler spoke by phone with Cafone about the situation. Cafone testified that it was up to the police whether to come to the casino to investigate the matter. She told Wheeler that it was suspicious that a group of individuals from Maryland had all opened new accounts and deposited the same amount in cash at the same time. She did not mention anything about a fraud or scheme.

When they arrived at the casino, Wheeler and Smallwood proceeded to the Wi-Fi lounge where they saw an individual who was later identified as Mills sitting on the couch with a computer and communicating to two other people nearby. When asked at his deposition if he observed anyone doing anything overtly illegal during this surveillance, Wheeler responded "[t]hey were on the phone. The person who was eventually

identified as Mr. Mills was directing activities to the other two."

Wheeler and Smallwood surveilled plaintiff and the others before Wheeler called Lieutenant Michael Flory, head of the Intelligence Management Unit, for backup in conducting surveillance. Flory and Officer Lance Moorhouse responded as backup as did defendant Officer Nelson[5] and Officer Mark Devine.[6] Nelson and Devine spoke to Moorhouse and Smallwood when they arrived at the casino and were told to surveil the suspect in the lounge.

Nelson was not informed of any criminal activity occurring at the time but was instructed to conduct physical surveillance on the person of interest in the lounge, that is the plaintiff, and follow him if he moved. Nelson and Devine did so for about fifteen to twenty minutes during which they observed plaintiff use his phone but could not hear what he was saying.

Eventually Moorhouse and Smallwood followed to the parking garage the others who had been talking to plaintiff. Wheeler and Flory subsequently joined them. Smallwood and

---

5. Nelson has worked in the Casino Gaming Bureau since 2014 and was working for the Special Investigations Unit on November 2, 2017.

6. Devine worked in the Strategic Investigations Unit on November 2, 2017.

Moorhouse stopped a person who was later identified as Chun along with his friends in the garage. Wheeler then arrived and arrested Chun and the others.

When Wheeler was arresting Chun, Chun told him he was there to make money from the casino. At this point, Wheeler called Devine and directed that he and Nelson were to arrest plaintiff. According to Devine, Wheeler had told him on the phone that Wheeler had probable cause based on the totality of the circumstances that plaintiff was "involved in some kind of a scam, some kind of comp [computer] scam or something of that nature." Devine then told Nelson that they were to arrest plaintiff and escort him out of the lounge and back to the police station.

Based on Wheeler's orders, Nelson and Devine approached plaintiff in the casino lounge, identified themselves as police officers, and informed him he was under arrest. They took him outside the lounge, handcuffed him, searched him, and transported him to the police station where he was placed in the holding cell area, fingerprinted, and interviewed. They were there for approximately two to three hours. Plaintiff was subsequently charged with theft by deception and released. His wallet and briefcase were given back to him but not his laptop and cell phone. Wheeler prepared the investigation report and typed up the summons and criminal complaint against plaintiff.

On November 10, 2017, some eight days after the arrest of plaintiff and Chun, Golden Nugget concluded its investigation into Chun's account. Cato advised Chun that day by email that his account was open and available for playing or cash-out. On June 1, 2018, the New Jersey Attorney General's office dismissed the charge against plaintiff "in the interests of justice." Thereafter plaintiff's phone and laptop were returned.

III

Plaintiff brings a claim under 42 U.S.C. § 1983 for malicious prosecution in violation of his Fourth and Fourteenth Amendment rights under the United States Constitution. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To succeed on a claim under § 1983 a plaintiff must prove: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged deprivation was committed or caused by a person amendable to suit under § 1983 and acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

Analysis of a § 1983 claim begins with identifying "the exact contours of the underlying right said to have been violated" and then determining "whether the plaintiff has alleged a deprivation of a constitutional right at all." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). In a malicious prosecution claim under § 1983, a plaintiff must prove: (1) "the defendants initiated a criminal proceeding"; (2) "the criminal proceeding ended in the plaintiff's favor"; (3) "the proceeding was initiated without probable cause"; (4) "the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice"; and (5) "the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005).

However, the doctrine of qualified immunity shields government officials from monetary damages in a § 1983 action unless a plaintiff establishes: (1) "that the official violated a statutory or constitutional right;" and (2) "that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed

questions of law and fact.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)). "[Q]ualified immunity is an objective question to be decided by the court as a matter of law." Curley v. Klem, 499 F.3d 199, 210 (3d Cir. 2007). Courts are to provide "ample room for mistaken judgments" pursuant to the doctrine of qualified immunity before imposing civil liability upon law enforcement officers. Malley v. Briggs, 475 U.S. 335, 343 (1985).

As our Court of Appeals has previously stated, "there is no question that the right at issue, namely, the right to be free from arrest except on probable cause, was clearly established at the time of [plaintiffs'] arrest." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995). This finding, however, "does not end the court's inquiry" since "the Supreme Court has recognized that it is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause to make an arrest is present." Id. In those instances officers who acted reasonably will not be held personally liable. Id. Immunity therefore depends on whether the officer's actions were objectively reasonable. Id.

In Rogers v. Powell, a § 1983 action, our Court of Appeals explained that statements of fellow officers conveying that there is probable cause to arrest only establish probable

cause if these statements "are supported by actual facts that satisfy the probable cause standard." 120 F.3d 446, 453 (3d Cir. 1997). Thus whether plaintiff's arrest was lawful depends on whether Wheeler, the investigating officer who instructed Devine to arrest plaintiff, had probable cause to support the arrest.

In Rogers, a police officer received "vague and inconclusive statements" regarding the existence of an arrest warrant that did not in fact exist and relied on that supposed arrest warrant in making an arrest. Id. at 449. Another officer assisted in the arrest based on the first officer's representations to him of a valid arrest warrant. The Court of Appeals found that the arrest itself was unlawful because the first officer "had no knowledge of any facts or circumstances to support his own independent determination that probable cause to arrest [plaintiff] existed." Id. at 453.

However, even if an arrest is unlawful, the doctrine of qualified immunity may still shield an officer from liability if he reasonably relies on "what proves to be the flawed conclusions of a fellow police officer." Id. at 454-55. "[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity . . . provided it was objectively reasonable

for him to believe, on the basis of the statements, that probable cause for the arrest existed." Id. at 455.

The Court of Appeals concluded in Rogers that it was not reasonable for the first officer to believe that probable cause existed because he never received "any statement confirming the existence of probable cause or a warrant itself." Id. at 456. Nonetheless, it was objectively reasonable for the second officer to believe there was probable cause for the arrest since the first officer, contrary to what he had been told, "unambiguously related [to the second officer] the existence of an arrest warrant." Id. That second officer had qualified immunity.

In this matter it was objectively reasonable for Nelson to believe probable cause existed for plaintiff's arrest based on Devine's directive that they were to arrest plaintiff. This directive was based on Devine's conversation with Wheeler, an experienced investigating officer, who explained that there was probable cause based on the totality of the circumstances that plaintiff was involved in a kind of computer scam. Devine reasonably relied on what Wheeler told him. Nelson in turn reasonably relied on Devine's good faith directive to aid him in arresting plaintiff since Devine's directive was based on what Wheeler had just told Devine about the existence of probable

cause. See id. at 455; see also Whiteley v. Warden, 401 U.S. 560, 568 (1971).

Nelson is shielded from liability for plaintiff's arrest by qualified immunity. Accordingly, this court will grant Nelson's motion for summary judgment and deny plaintiff's motion for summary judgment as to Count IX.

IV

Plaintiff has a remaining claim for malicious prosecution under the New Jersey Tort Claims Act ("NJTCA"). Malicious prosecution is part of "a group of closely related torts that although ancient in origins, are treated with great caution because of their capacity to chill resort to our courts by persons who believe that they have a criminal complaint or civil claim against another." LoBiondo v. Schwartz, 970 A.2d 1007, 1022 (N.J. 2009).

The tort of malicious prosecution is meant to remedy harm from "the institution or continuation of a criminal action that is baseless." Id. It requires plaintiff to prove: (1) "a criminal action was instituted by this defendant against this plaintiff"; (2) "the action was motivated by malice"; (3) "there was an absence of probable cause to prosecute"; and (4) "the action was terminated favorably to the plaintiff." Id.

However, the NJTCA provides a public employee immunity from liability for a tort when "he acts in good faith in the

execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J. Stat. Ann. § 59:3-3. The New Jersey Supreme Court has held that a public employee "must 'establish that his or her acts were objectively reasonable or that he or she performed them with subjective good faith.' Therefore, an employee may be immune from liability under either an objective or subjective analysis." Leang v. Jersey City Bd. of Ed., 969 A.2d 1097, 1112 (N.J. 2009)(quoting Canico v Hurtado, 676 A.2d 1083, 1085 (N.J. 1996)).

"A public employee need prove only one component." Alston v. City of Camden, 773 A.2d 693, 703 (N.J. 2001). "The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith under the [NJTCA]." Wildoner v. Borough of Ramsey, 744 A.2d 1146, 1153 (N.J. 2000). "The subjective component refers to 'permissible intentions.'" Alston, 773 A.2d at 703. Under the NJTCA, immunity is the "general rule, with liability the exception." Rosario v. City of Union City Police Dep't, 131 F. App'x 785, 789 (3d Cir. 2005).

As with qualified immunity for plaintiff's § 1983 claim for malicious prosecution, Nelson is also shielded from liability for plaintiff's claim for malicious prosecution under state law based on good faith immunity. Again, it was

objectively reasonable for Nelson to believe probable cause existed for plaintiff's arrest based on Devine's good faith directive to do so. Devine acted in good faith because Wheeler, an experienced officer, told him there was probable cause to arrest plaintiff for a computer scam. Accordingly, summary judgment in favor of Nelson will be granted as to Count IV. Plaintiff's motion for partial summary judgment will consequently be denied as to Count IV.